J-S04032-20 & J-S04033-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF: C.M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2625 EDA 2019 |

Appeal from the Decree Entered August 13, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000288-2019

| | | |
|---|---|---|
| IN THE MATTER OF: C.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2626 EDA 2019 |

Appeal from the Order Entered August 13, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0002914-2017

BEFORE:  BENDER, P.J.E., STABILE, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED FEBRUARY 04, 2020**

J.C. (Mother) appeals from the order changing the permanency goal

from reunification to adoption with respect to her daughter, C.W. (Child), born

in July of 2017, and the decree involuntarily terminating Mother's parental rights.[1]  Upon careful review, we affirm.

Child was placed in the emergency protective custody of the Philadelphia Department of Human Services (DHS) on November 1, 2017, following a report alleging, among other things, that Mother suffered from untreated mental health issues; she was homeless; and she had not taken Child to regular medical appointments.  Trial Court Opinion, 10/23/19, at 2; Statement of Facts, 4/16/19, at ¶ f.[2]  The court adjudicated Child dependent on November 13, 2017.

Child's permanency goal was reunification.  The Community Umbrella Agency (CUA) established the following objectives for Mother:  participate in Achieving Reunification Center (ARC) programs offered for housing, employment, and domestic violence; participate in supervised visitation; comply with mental health treatment; and attend Family School.  Trial Court Opinion, 10/23/19, at 2.  The court conducted permanency review hearings in February of 2018, May of 2018, August of 2018, November of 2018, January of 2019, and May of 2019.  Mother's visits with Child remained supervised.

---

[1] By separate decree entered on August 13, 2019, the court involuntarily terminated the parental rights of M.W. (Father).  Father did not appeal.

[2] During the underlying proceeding, Mother's counsel stipulated to the statement of facts attached to the petition for the involuntary termination of parental rights.  N.T., 8/13/19, at 18.

On April 16, 2019, DHS filed petitions to change Child's permanency goal to adoption and involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The trial court held a combined hearing on August 13, 2019,[3, 4] during which DHS presented the testimony of the CUA case manager, Carol Smith. Mother testified on her own behalf.

By decree dated and entered August 13, 2019, the trial court involuntarily terminated Mother's parental rights; by order dated and entered August 13, 2019, the trial court changed Child's goal to adoption.

Mother timely filed separate notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a Rule 1925(a) opinion on October 23, 2019.

We begin Mother's issues with respect to the goal change order, which we review according to the following standard:

> In cases involving a court's order changing the placement goal . . . to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must

---

[3] In addition to the petitions for goal change and involuntary termination with respect to Child, the trial court heard evidence involving permanency for Child's younger brother, K.W., who resides in the same foster home as Child. N.T., 8/13/19, at 3, 10. K.W. is not a subject of this appeal.

[4] During the proceeding, Child's legal interests were represented by Angelina Dagher, Esquire, and her best interests were represented by Deborah Fegan, Esquire.

determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008) (citations omitted).

Mother raises five issues relative to the goal change as follows:

1. Whether the trial court erred by changing the permanency goal to adoption pursuant to 23 Pa.C.S.A. [§] 2511(a)(1) without clear and convincing evidence of [M]other's intent to relinquish her parental claim or refusal to perform her parental duties.

2. Whether the trial court erred by changing the permanency goal to adoption pursuant to 23 Pa.C.S.A. [§] 2511(a)(2) without clear and convincing evidence of [M]other's present incapacity to perform parental duties.

3. Whether the trial court erred by changing the permanency goal to adoption pursuant to 23 Pa.C.S.A. [§] 2511(a)(5) without clear and convincing evidence to prove that reasonable efforts were made by Department of Human Services to provide [M]other with additional services and that the conditions that led to placement of [C]hild continue to exist.

4. Whether the trial court erred by changing the permanency goal to adoption pursuant to 23 Pa.C.S.A. [§] 2511(a)(8) without clear and convincing evidence that the conditions that led to placement of [C]hild continue to exist when [M]other presented evidence of compliance with the goals and objectives of her single case plan.

5. Whether the trial court erred by changing the permanency goal to adoption pursuant to 23 Pa.C.S.A. [§] 2511(b) without clear and convincing evidence that there is no parental bond between [M]other and [C]hild and that changing the permanency goal to adoption would serve the best interest of [C]hild.

Mother's Brief at 7.

A goal change request is governed by Section 6351(f) of the Juvenile Act, 42 Pa.C.S.A. § 6351(f), which requires the trial court to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the child; and (5) a likely date by which the goal for the child might be achieved. *In re S.B.*, 943 A.2d at 977. The best interests of the child, and not the interests of the parent, must guide the trial court. *Id.* at 978.

In her brief, Mother does not set forth the law that governs goal change. Rather, she cites Section 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, which concerns the involuntary termination of parental rights. Because Mother fails to discuss any relevant statutory or case law, we conclude that her issues are waived with respect to the goal change order. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating that issues are waived if appellate brief fails to provide meaningful discussion with citation to relevant authority); *see also* Pa.R.A.P. 2119(b). As such, we affirm the order changing Child's permanency goal to adoption.

Turning to Mother's issues regarding the termination of her parental rights, we also review for an abuse of discretion. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Mother's issues are as follows:

1. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. [§] 2511(a)(1) without clear and convincing evidence of [M]other's intent to relinquish her parental claim or refusal to perform her parental duties.

2. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. [§] 2511(a)(2) without clear and convincing evidence of [M]other's present incapacity to perform parental duties.

3. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. [§] 2511(a)(5) without clear and convincing evidence to prove that reasonable efforts were made by Department of Human Services to provide [M]other with additional services and that the conditions that led to placement of [C]hild continue to exist.

4. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. [§] 2511(a)(8) without clear and convincing evidence that the conditions that led to placement of [C]hild continue to exist when [M]other presented evidence of compliance with the goals and objectives of her single case plan.

5. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. [§] 2511(b) without clear and convincing evidence that there is no parental bond between [M]other and [C]hild and that termination would serve the best interest of [C]hild.

Mother's Brief at 7.

Section 2511 of the Adoption Act requires a bifurcated analysis in considering the involuntary termination of parental rights:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis

- 6 -

concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, we conclude that the certified record supports the decree pursuant to Section 2511(a)(1) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).[5]

---

[5] Based on this disposition, we need not consider Mother's issues with respect to Section 2511(a)(2), (5), and (8).  *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).

With regard to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citation omitted). We have explained:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re N.M.B.*, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

Our Supreme Court has explained that parental duty "is best understood in relation to the needs of a child." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977).

> A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

*Id.* (citations omitted).

Concerning Section 2511(b), this Court has stated, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the

needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted). Further, we have held that the trial court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert. *In re K.K.R.-S*., 958 A.2d 529, 533 (Pa. Super. 2008).

Instantly, Mother argues that the evidence is insufficient to support the termination of her parental rights pursuant to Section 2511(a)(1). Mother argues that the court found, by July of 2018, that she complied with all the programs offered through ARC, and she was actively engaged in mental health services. With respect to supervised visitation, Mother asserts that she consistently attended during the first 18 months of Child's dependency. Mother concedes that she was inconsistent with visitation three months prior to the filing of the termination petition. However, Mother claims that CUA failed to provide adequate transportation assistance for her to attend the visits. This argument is not persuasive.

Ms. Smith, the CUA case manager, testified that Mother failed to complete her permanency objectives involving Family School and mental health services. Specifically, on March 8, 2019, Mother was discharged from Family School for lack of attendance. N.T., 8/13/19, at 7-8, 37. Likewise, she was discharged from her mental health provider, Northeast Community Behavioral Health, for lack of attendance. *Id.* at 11-12, 29.

Mother testified that she has bipolar disorder. *Id.* at 49. She testified that she began treatment at Northeast Community Behavioral Health approximately 16 months prior. *Id.* at 48. Mother conceded that she did not attend the appointments regularly. *Id.* She stated on direct examination:

[Q.] Could you tell us how many you missed?

[A.] I was scheduled to go weekly, and I would go like, probably, like, twice a month or once a month, so . . . there was quite a few that I missed. Me and my therapist did not have a good relationship, and they were medicating me incorrectly.

*Id.* at 49. Mother then testified that the psychiatrist at Northeast Community Behavioral Health switched her to a different medication, from which she developed no negative side effects. *Id.* at 51. Mother explained that in April of 2019, after approximately one year of attending appointments inconsistently at Northeast Community Behavioral Health, she changed

mental health providers. *Id.* at 50-51. Mother did not identify the new mental health provider.[6]

As to supervised visitation, Ms. Smith testified that since the last court date in May of 2019, Mother attended seven of 13 scheduled visits.[7] *Id.* at 19. Mother acknowledged that she "did miss quite a few [visits] either because I couldn't get there or my asthma was acting up on one of them. I had a rash from the shelter for one of them, so, I didn't go, because it was contagious. . . ." *Id.* at 60. Mother subsequently testified that on another occasion, "I was really late to the agency because of a thunderstorm." *Id.* Mother stated that she took the bus to supervised visitation, but that CUA has not given her tokens for the bus "in months." *Id.* at 61. Mother testified on direct examination:

[Q.] So, when you go to a visit, do you ask them for tokens?

[M.] They said I have to put [the request] in a week prior, and when I text [Ms.] Smith and ask her, it's -- either she forgets or her -- she's busy. I don't know, but I don't get any reply.

*Id.*

Ms. Smith testified on rebuttal that Mother "hasn't had an asthma flare-up this summer," and to her knowledge, Mother did not miss any visits because of a thunderstorm. *Id.* at 75. Rather, Ms. Smith testified that Mother

---

[6] Ms. Smith did not dispute that on April 1, 2019, Mother began mental health treatment at Community Council. N.T., 8/13/19, at 11-12.

[7] Included in the seven visits was Mother's supervised visit on the morning of the underlying proceeding. *Id.* at 19.

missed visits because Mother did not confirm them, or she was late. *Id.* at 74. With respect to assisting Mother with transportation to the visits, Ms. Smith testified that she provided assistance when Mother asked. *Id.* at 78. Ms. Smith explained that Mother "knows she has to ask for transportation [assistance] 48 hours in advance." *Id.* On inquiry by the trial court, Ms. Smith testified:

[Q.] Did she ask you for assistance?

[A.] Yes. And every time mom asked me, I would give [transportation assistance] to her.

*Id.* at 79.

As to housing, Ms. Smith testified that since January of 2019, Mother moved four times. *Id.* at 38. She stated that Mother most recently secured "a boarding room," which was not suitable for Child because it needs a circuit breaker and a stove. *Id.* at 10. On cross-examination by Mother's counsel, Ms. Smith testified that Mother lives on the second floor of a duplex, and has a roommate. *Id.* at 32-33.

On cross-examination by Child's best interests counsel, Mother testified that in the last two years, she has had approximately seven residences. *Id.* at 71. Mother explained:

[Q.] So, you have a pattern of changing your residences frequently; is that fair to say?

[A.] It's not really a pattern. It's just when they came out to look at the . . . places, my friend's home or the rooms that I had for rent, [they were] not approved.

. . .

[Q.] Well, you have a pattern of picking inappropriate places, then . . . for you to live with [Child] –

. . .

[Q.] – is that fair to say?

[A.] [W]hen they advertise these places, they don't look inappropriate, but when you go live there, they're inappropriate.

*Id.* at 69-71.

Ms. Smith likewise testified that Mother has had multiple jobs since the most recent court date in May of 2019. *Id.* at 42. Ms. Smith testified that Mother's jobs normally lasted no longer than one month. *Id.* She explained that Mother was last employed two weeks prior at Kentucky Fried Chicken, but she quit that job. *Id.* at 31. On direct examination, Mother stated that she quit because "I tried to date a co-worker, and it became dangerous. . . ." *Id.* at 57. Mother acknowledged on inquiry by the trial court, "I have a hard time keeping a job." *Id.* at 67.

Based on the foregoing testimony, we discern no abuse of discretion by the trial court in terminating Mother's parental rights pursuant to Section 2511(a)(1). Mother has failed to successfully complete any of her permanency plan objectives throughout the 22 months that Child has been dependent. As such, Mother has refused or failed to perform parental duties far in excess of the statutory six-month minimum.

With respect to Section 2511(b), Mother argues that the evidence was insufficient because she "has established that a strong emotional bond exists between her [C]hild, and that she can provide for [C]hild's needs." Mother's Brief at 14. We disagree.

This Court has explained:

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010).

Further, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

The testimony of Ms. Smith supports the trial court's conclusion that, pursuant to Section 2511(b), there is no parent-child bond between Mother and Child. N.T., 8/13/19, at 21. Ms. Smith explained that Child would not

suffer any detriment if Mother's parental rights are terminated because Mother "has a history of inconsistency with mental health, employment, housing, and visitation. Mother is unstable, impulsive, and does not take responsibility for decisions that she makes that negatively affect her child." *Id.* at 23. Conversely, Ms. Smith testified that Child will suffer irreparable harm if she is removed from her foster parents, with whom she has lived since she was four months old. *Id.* at 24. In addition, Child's legal counsel stated on the record in open court that a parent-child bond exists between foster parents and Child. *Id.* at 27. In sum, the evidence establishes that termination serves the developmental, physical, and emotional needs and welfare of Child. Accordingly, we affirm the decree.

Decree affirmed. Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/4/20